IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS


DONALD EUGENE HALPIN,          )
)
               Plaintiff,   )   **CIVIL ACTION**
)
v.                    )   No. 01-3188-MLB
)
WILLIAM L. CUMMINGS, et al.,  )
)
               Defendants.  )
_____)

## MEMORANDUM AND ORDER

## I.  INTRODUCTION

This case comes before the court on the following motions and related briefs:

1) Motion for judgment on the pleadings by defendants William Cummings, David R. McKune, and Duane Muckenthaler, with associated briefs.  (Docs. 127, 128, 138, 139, 160, 189, 195, 218.)

2) Plaintiff's motion for partial summary judgment, with associated briefs.  (Docs. 140, 141, 142, 163, 181.)

3) Motion for summary judgment by defendants Prison Health Services, Inc. (PHS), Angela Goehring, Dr. Akin Ayeni, Dr. James Baker, Dr. Stephen Dayan, and Dr. Sandip Naik (Medical Defendants), with associated briefs.  (Docs. 164, 165, 183, 190.)

4) Plaintiff's motion to strike defendants' reply brief associated with the preceding motion.  (Docs. 198, 201.)

Plaintiff is serving a life sentence stemming from convictions in Florida in the early 1980s.  He was transferred to Kansas in 1997

pursuant to the Interstate Corrections Compact, K.S.A. 76-3001 to 76-3003.  He has suffered heart problems since at least the early 1990s, and he alleges more recent bouts with his sinuses and a severe skin infection.  Based on allegations of constitutionally deficient medical care by prison doctors, plaintiff brings the current suit under 42 U.S.C. § 1983 claiming that defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment to the United States Constitution.  (Doc. 13.)

This case was originally assigned to Judge Van Bebber who, pursuant to 28 U.S.C. 1915A(b), dismissed plaintiff's complaint prior to serving it on the defendants.  (Doc. 2 at 5.)  Plaintiff appealed this decision, and the Tenth Circuit affirmed on a number of the claims, but reversed as to the Eighth Amendment counts.  Halpin v. Simmons, 33 Fed. Appx. 961 (10th Cir. Apr. 4, 2002).  Following remand, Judge Van Bebber permitted plaintiff to amend his complaint, (Doc. 13); however, after reviewing the amended complaint, Judge Van Bebber issued an order circumscribing the claims that would go forward in the case.  (Doc. 12.)  Although plaintiff originally presented Eighth Amendment claims related to defendants' treatment of certain gastro-intestinal maladies, the amended complaint omitted those claims.  Id. at 3.  Plaintiff has never objected to this ruling.  In fact, his response to the Medical Defendants' motion for summary judgment addresses only the claims for his heart condition, sinuses, and skin infection, thus showing his implicit understanding that those are the only claims in the case, at least as to the Medical Defendants.  (Doc. 183 at 8-11.)  Accordingly, the only Eighth Amendment claims remaining in the case are those related to

plaintiff's heart condition, sinus condition, and skin infection.  Id.

## II.   MOTION FOR JUDGMENT ON THE PLEADINGS

Defendants Cummings, McKune, and Muckenthaler (Kansas Department of Corrections (KDOC) Defendants) argue that the allegations in the complaint are insufficient to state a claim against them.  (Doc. 128.) In evaluating a motion pursuant to Federal Rule of Civil Procedure 12(c), the court applies the same standard as it would in deciding a motion for failure to state a claim under Rule 12(b)(6).  Nelson v. State Farm Mut. Auto. Ins. Co., 419 F.3d 1117, 1119 (10th Cir. 2005). Under that standard, the court must

> accept all well-pleaded factual allegations in the complaint as true and view them in the light most favorable to the nonmoving party. A dismissal pursuant to 12(b)(6) will be [granted] only when it appears that the plaintiff can prove no set of facts in support of the claims that would entitle the plaintiff to relief.

Id. (quotation omitted).

Before proceeding to that analysis, the court notes that this is the same standard that applies when evaluating a complaint under 28 U.S.C. § 1915A(b).  See DeSpain v. Uphoff, 2000 WL 1228003, *2 (10th Cir. Aug. 30, 2000.)  Although the Tenth Circuit did not expressly describe its methodology in reviewing Judge Van Bebber's dismissal under section 1915A, it is apparent that the court of appeals applied the Rule 12(b)(6) standard when it said, in unequivocal terms, "We . . . hold that these allegations are sufficient to state an Eighth Amendment claim."  Halpin, 33 Fed. Appx. at 965.  Since the court of appeals has already rendered a decision that plaintiff's complaint is sufficient to state an Eighth Amendment claim, the court finds that it would be imprudent and a waste of time to rehash those issues,

especially in light of the fact that the KDOC Defendants have made no attempt to distinguish the current posture of this case from the condition it was in when presented to the court of appeals.  While the Tenth Circuit's order and judgment in this case does not foreclose a motion for summary judgment by the KDOC Defendants, a contested motion to dismiss for failing to state a claim will not be granted.  Be that as it may, plaintiff asks the court to dismiss defendant Muckenthaler from the case.  (Doc. 195 at 2.)  Plaintiff's request is GRANTED, and defendant Muckenthaler is dismissed from the case.  In all other respects, the motion by the KDOC Defendants is DENIED.

**III.  MOTIONS FOR SUMMARY JUDGMENT**

The Medical Defendants have submitted a motion for summary judgment as to all claims against them.  (Doc. 164.)  Plaintiff has submitted a motion for summary judgment as to two of the Medical Defendants, Drs. Ayeni and Dayan.  (Doc. 140.)  Thus, as to these two defendants, the court is presented with cross-motions for summary judgment.

A.  Summary Judgment Standard: Fed. R. Civ. P. 56 - Cross Motions

The usual and primary purpose of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  Federal Rule of Civil Procedure 56(c) directs the entry of summary judgment in favor of a party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  An issue is "genuine" if sufficient evidence exists on each side "so that a rational trier of fact could resolve the issue either way" and "[a]n issue of fact is 'material' if under the

-4-

substantive law it is essential to the proper disposition of the claim." Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998) (citations omitted); see also Adams v. Am. Guarantee & Liab. Ins. Co., 233 F.3d 1242, 1246 (10th Cir. 2000) (citing Adler).  The mere existence of some factual dispute will not defeat an otherwise properly supported motion for summary judgment because the factual dispute must be material.  See Renfro v. City of Emporia, 948 F.2d 1529, 1533 (10th Cir. 1991).

> 1.   Moving Party's Burden

The moving party must initially show both an absence of a genuine issue of material fact, as well as entitlement to judgment as a matter of law.  Adler, 144 F.3d at 670.  The nature of the showing depends upon whether the movant bears the burden of proof at trial with respect to the particular claim or defense at issue in the motion. If the nonmoving party bears the burden of proof, the movant need not "support its motion with affidavits or other similar materials negating the opponent's" claims or defenses.  Celotex, 477 U.S. at 323 (emphasis in original).  Rather, the movant can satisfy its obligation simply by pointing out the absence of evidence on an essential element of the nonmovant's claim.  Adler, 144 F.3d at 671 (citing Celotex, 477 U.S. at 325).

On the other hand, if the movant has the burden of proof on a claim or defense raised in a summary judgment motion, it must show that the undisputed facts establish every element of the claim entitling it to judgment as a matter of law.  See e.g., United States v. Four Parcels of Real Property, 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc); United Mo. Bank of Kansas City v. Gagel, 815 F. Supp. 387,

391 (D. Kan. 1993); see also Celotex Corp., 477 U.S. at 331 (Brennan, J., dissenting) ("If the moving party will bear the burden of persuasion at trial, that party must support its motion with credible evidence – using any of the materials specified in Rule 56(c) that would entitle it to a directed verdict if not controverted at trial.").[1]   Moreover, the moving party must show the absence of genuine issues of fact regarding each of the affirmative defenses specifically reserved by the non-moving party. Gagel, 815 F. Supp. at 391.  "The party moving for summary judgment must establish its entitlement beyond a reasonable doubt." Id.

  2.   Non-Moving Party's Burden

    If the moving party properly supports its motion, the burden shifts to the nonmoving party, "who may not rest upon the mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Muck v. United States, 3 F.3d 1378, 1380 (10th Cir. 1993).  In setting forward these specific facts, the nonmovant must identify the facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." Adler, 144 F.3d at 671.  If the evidence offered in opposition to summary judgment is merely colorable or is not significantly probative, summary judgment may be granted.  Cone

---

  [1]  The court notes that the Rule 56 summary judgment standard is identical to that of a Rule 50 judgment as a matter of law standard, see Pendleton v. Conoco, Inc., 23 F.3d 281, 286 (10th Cir. 1994), and that "[t]he standard is particularly strict when such a ruling is made in favor of the party with the burden of proof." Weese v. Schukman, 98 F.3d 542, 547 (10th Cir. 1996).  Under this strict test, the party bearing the burden of proof at trial earns a favorable ruling only when evidence is presented that "the jury would not be at liberty to disbelieve." Weese, 98 F.3d at 547.

v. Longmont United Hosp. Ass'n, 14 F.3d 526, 533 (10th Cir. 1994).
A party opposing summary judgment "cannot rely on ignorance of facts,
on speculation, or on suspicion, and may not escape summary judgment
in the mere hope that something will turn up at trial." Conaway v.
Smith, 853 F.2d 789, 793 (10th Cir. 1988), aff'd 939 F.2d 910 (10th
Cir. 1991). Put simply, the nonmoving party must "do more than simply
show there is some metaphysical doubt as to the material facts."
Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-
87 (1986).

        3.   Presentation of Evidence

     Certain local rules further govern the presentation of facts and
evidence.  Local Rule 56.1 requires the movant to set forth a concise
statement of material facts.  D. Kan. Rule 56.1.  Each fact must
appear in a separately numbered paragraph and each paragraph must
refer with particularity to the portion of the record upon which the
defendant relies.  See id.  The opposing memorandum must contain a
similar statement of facts.  Plaintiff must number each fact in
dispute, refer with particularity to those portions of the record upon
which he relies and, if applicable, state the number of the
defendants' fact that he disputes.  The court may, but is not
obligated to, search for and consider evidence in the record that
would rebut one party's evidence, but that the opposing party has
failed to cite.  See Mitchell v. City of Moore, 218 F.3d 1190, 1199
(10th Cir. 2000); Adler, 144 F.3d at 672.  All material facts set
forth in the statements of fact are deemed to be admitted for the
purpose of summary judgment unless specifically controverted.  See
Gullickson v. Sw. Airlines Pilots' Ass'n, 87 F.3d 1176, 1183 (10th

Cir. 1996) (applying local rules of District of Utah).  A standing order of this court also precludes drawing inferences or making arguments within the statement of facts.

The parties need not present evidence in a form that would be admissible at trial, but the content or substance of the evidence must be admissible.  <u>See</u> <u>Thomas v. Int'l Bus. Mach's.</u>, 48 F.3d 478, 485 (10th Cir. 1995) (internal quotations and citations omitted).  For example, hearsay testimony that would be inadmissible at trial may not be included.  <u>See</u> <u>Adams</u>, 233 F.3d at 1246.  Similarly, the court will disregard conclusory statements and statements not based on personal knowledge. <u>See</u> <u>Cole v. Ruidoso Mun. Schs.</u>, 43 F.3d 1373, 1382 (10th Cir. 1994) (regarding conclusory statements); <u>Gross v. Burggraf Constr. Co.</u>, 53 F.3d 1531, 1541 (10th Cir. 1995) (requiring personal knowledge).  Finally, the court may disregard facts supported only by references to documents unless the parties have stipulated to the admissibility of the documents or the documents have been authenticated by and attached to an affidavit meeting the requirements of Rule 56(e).  <u>See</u> Fed. R. Civ. P. 56(e); D. Kan. Rule 56.1; 10A Charles Alan Wright, et al., <u>Fed. Practice and Procedure</u> § 2722 (2d ed. 1983) (footnotes omitted).

Given that plaintiff is proceeding <u>pro se</u>, the court will also credit as evidence statements made by him in his pleadings and briefs, so long as the statements were based on personal knowledge and made under penalty of perjury.[2] <u>Hall v. Bellmon</u>, 935 F.2d 1106, 1111 (10th

_____

[2] Given that this case involves complex issues of medical treatment, plaintiff's ability to make statements regarding his medical condition based on personal knowledge is somewhat limited. While he can provide statements regarding what he did, the pain he

Cir. 1991).  However, as noted above, the court is under no obligation to comb the record in search of such sworn statements.  Rather, under the applicable procedural rules, it is the duty of the parties contesting a motion for summary judgment to direct the court to those places in the record where evidence exists to support their positions.  Plaintiff's <u>pro se</u> status does not absolve him from compliance with the rules of procedure, including the local rules and this court's standing order.  <u>See</u> <u>Nielsen v. Price</u>, 17 F.3d 1276, 1277 (10th Cir. 1994).

          4.    Summary

     In the end, when confronted with a fully briefed motion for summary judgment, the court must determine "whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986).  If sufficient evidence exists on which a trier of fact could reasonably find for the plaintiff, summary judgment is inappropriate.[3]  <u>See</u> <u>Prenalta Corp. v.</u>

---

felt, etc., he lacks the expertise to diagnose his medical maladies or critique the treatment offered by other medical professionals. Accordingly, any statements made by plaintiff that amount to expert testimony regarding medical matters are conclusory, and have no evidentiary value.

     [3]  Even though the parties have filed cross-motions for summary judgment, the legal standard does not change.  <u>See</u> <u>O'Connor v. Check Rite, Ltd.</u>, 973 F. Supp. 1010, 1014 (D. Colo. 1997); <u>United Wats, Inc. v. Cincinnati Ins. Co.</u>, 971 F. Supp. 1375, 1382 (D. Kan. 1997).  It remains this court's sole objective to discern whether there are any disputes of material facts.  <u>See</u> <u>Harrison W. Corp. v. Gulf Oil Co.</u>, 662 F.2d 690, 692 (10th Cir. 1981). The court is, however, justified in assuming that no evidence needs to be considered apart from what has been filed.  <u>See</u> <u>James Barlow Family Ltd. Partnership v. Munson, Inc.</u>, 132 F.3d 1316, 1319 (10th Cir. 1997).  Additionally, the Tenth

<u>Colo. Interstate Gas Co.</u>, 944 F.2d 677, 684 (10th Cir. 1991).

B.   Facts[4]

Plaintiff asserts claims for deliberate indifference to his serious medical needs based on three different ailments: 1) his heart condition; 2) his sinus condition; and, 3) a skin infection.  Since these maladies overlap in time, and since the chronology of events is important in determining whether defendants' conduct amounted to a constitutional violation with respect to any of the medical conditions, the court will initially summarize the facts separately for each ailment.

1.   Heart Condition

In the years prior to his transfer to Kansas, plaintiff suffered at least two heart attacks.  (Doc. 13 at 8.)  While he was in the custody of the Florida Department of Corrections, he apparently underwent surgical angioplasty to remove obstructions from the blood vessels going to his heart.  (Doc. 198 exh. A at 921, physician's

_____

Circuit has made it clear that each motion is to be treated separately - the denial of one does not require the granting of the other.  <u>See</u> <u>Atl. Richfield Co. v. Farm Credit Bank of Wichita</u>, 226 F.3d 1138, 1148 (10th Cir. 2000) (quoting <u>Buell Cabinet Co. v. Sudduth</u>, 608 F.2d 431, 433 (10th Cir. 1979)); <u>Abbot v. Chem. Trust</u>, No. 01-2049-JWL, 2001 WL 492388, at *4 n.11 (D. Kan. Apr. 26, 2001).  Rather, this court must hold each party to their respective burden depending upon their status as a moving or nonmoving party and whether they would have the burden of proof on a particular issue at trial .  <u>See</u> <u>Stewart v. Nationalease of Kansas City, Inc.</u>, 920 F. Supp. 1188, 1202 (D. Kan. 1996).

[4] Although many of the documents submitted by plaintiff are arguably not authenticated, defendants do not raise this issue. Rather than address the matter sua sponte, the court assumes the authenticity of the medical records, letters, and other documentary evidence submitted by plaintiff.

note, Feb. 26, 1996.)[5]  His medical records show that he underwent a
heart catheterization in 1994, from which the doctor concluded that
he suffered "three vessel coronary artery disease."  (Doc. 181 exh.
A at 904, medical procedure report, Jan. 31, 1994.)  However, this
report failed to mandate any particular treatment, noting instead that
"if the patient continues to have significant angina pectoris, despite
adequate  medical  therapy,  would  consider  revascularization  by
aortocoronary bypass graft surgery . . . ."  Id. (emphasis added).
Even construing this report in the light most favorable to plaintiff,

_____

[5] The court seriously considered striking this document from the
record.  Plaintiff has repeatedly filed unauthorized briefs that have
substantially increased the court's burden in attempting to review the
evidence in this case.  (See, e.g., Doc. 195, "Supplemental Response
to [KDOC Defendants'] motion for judgment on the pleadings;" Doc. 218,
(same  title).)   Some  of  these  unauthorized  filings  contained
substantial  evidentiary  exhibits  not  otherwise  presented  in  the
authorized briefs.  (See, e.g., Docs. 195, 218.)
    Federal Rule of Civil Procedure 83 authorizes the district courts
to enact local rules of practice, and those rules have the "force and
effect of law."  Woods Const. Co. v. Atlas Chem. Indus., Inc., 337
F.2d 888, 890 (10th Cir. 1964).  Local Rules 6.1(d), 7.1(c), and 56.1
contemplate only a brief in support of the motion, a response brief,
and a reply brief.  Further briefing is not authorized without leave
of court.  Moreover, what is implicit in the local rules is made
explicit in this court's standing order, which states, "Surreply
memoranda are not permitted."
    A review of plaintiff's Doc. 198, which he denominates a "motion
to strike reply brief of medical defendants . . .," shows that it is
utterly devoid of merit.  Rather, it appears to be a mere subterfuge
aimed at getting additional evidence into the record.  Surprisingly,
defendants make no objection to this motion other than to urge the
court to deny it on the merits.  (Doc. 201.)  Given defendants'
lethargic acceptance of plaintiff's efforts to perpetually seed the
record with additional evidence, and given the fact that most of the
evidence in Doc. 198 appears elsewhere in the record, the court will
not only consider the exhibits for their evidentiary value in deciding
the motions for summary judgment, but will rely heavily on this
document since, for once in this case, it appears to gather most of
the relevant evidence in one location for ease of review.
    All page citations to this document (and other evidentiary
documents submitted by plaintiff) refer to handwritten page numbers
located at the bottom of most sheets of the exhibits.

it clearly indicates that, in 1994, the recommended treatment regimen for his heart condition was medication, not surgery.

His medical records next show that, in February 1996, plaintiff was seen by Dr. Keith Moore for gastro-intestinal problems. As noted previously, any claim regarding gastro-intestinal maladies is out of the case; therefore, the court only considers this evidence to the extent it bears on plaintiff's cardiac condition and treatment. The doctor's report notes that plaintiff underwent angioplasty in 1992, that at the time of the visit he was suffering "recurrent episodes of chest pain," and that plaintiff had refused a second angioplasty because he was more concerned about his digestive problems. (Doc. 181 exh. A, at 921, physician's note, Feb. 26, 1996.) Dr. Moore concluded that, in order to proceed with treatment for plaintiff's digestive problems, medical personnel first needed to assess his cardiac condition. In light of that, the doctor recommended "[c]ardiac re-evaluation," among other unrelated treatments. Id. at 922. The note fails to suggest that plaintiff needed cardiac care based solely on the condition of his heart. Rather, it clearly indicates that cardiac care was recommended simply as a cautious prerequisite to any subsequent treatment of his gastro-intestinal issues.

Just over two months later, on May 3, 1996, plaintiff was seen by Dr. Nicoloff for a followup to Dr. Moore's evaluation. Dr. Nicoloff characterized the purpose of the visit as follows:

> The reason for this visit is angina pectoris and a preop surgical clearance because of an abnormally elevated CEA and a slight abnormality on gastrointestinal evaluation. Dr. Moore would like to rule out the possibility of a neoplasm and wants clearance to proceed with upper and lower colonoscopy.

(Doc. 181 exh. A at 912, physician's note, May 3, 1996.)  Dr. Nicoloff acknowledged plaintiff's history of heart disease, then made the following recommendations for treatment:

> 1) In light of the fact that [plaintiff] says the symptoms of angina seem to be much more stable at this point, <u>I feel that he would need to have a thallium stress test as soon as possible in order to determine if he can proceed with GI evaluation as ordered by Dr. Moore</u>.  2) If the thallium shows a significant abnormality, then he will have to have a cardiac catheterization first, and both of these recommendations were discussed with the patient at length, and he is agreeable to proceed with this.

<u>Id.</u> at 913 (emphasis added).  As the underlined statements make clear, the recommendation for a thallium stress test was only for the purpose of determining whether plaintiff could have the gastrointestinal treatment, not because of an independent need for cardiac care.

Finally, plaintiff provides a medical procedure report that shows on or about May 23, 1996, he underwent the recommended thallium stress test.  (Doc. 198 exh. A at 914, medical procedure report.)  The report narrated the details of the procedure and offered the following conclusions:

> 1.  Electrocardiogram shows an ischemic response to stress.
> 2.  Fixed inferior wall defect consistent with infarction.
> 3.  Reversible anterolateral defect consistent with myocardial ischemia.

<u>Id.</u>  Conversely, the report made no recommendations for treatment; nor has plaintiff presented any evidence that some qualified medical provider determined that the results of the thallium test amounted to a "significant abnormality" that could arguably be interpreted as triggering Dr. Nicoloff's recommendation for a heart catheterization.

-13-

(Doc. 181 exh. A at 913, physician's note, May 3, 1996.)  These are the only medical records that plaintiff provided regarding the cardiac care he received in Florida.

In July 1997, more than a year after his thallium test in Florida, plaintiff was transferred to the Lansing Correction Facility under the custody of the KDOC.  Shortly after his arrival, he was evaluated by medical personnel from PHS, a private company under contract with KDOC to provide medical care to Kansas state inmates. (Docs. 13 at 4; 42 at 2.)  Plaintiff asserts that during this initial evaluation, he attempted to give the aforementioned medical records to PHS physician, Dr. Stephen Dayan.  Plaintiff further claims that defendant Dayan refused to look at those records and implied his intent to ignore the recommendations from the Florida physicians. (Doc. 142 at 2-3.)

Even assuming that defendant Dayan so stated, the evidence does not bear out plaintiff's claims that the Florida recommendations were utterly ignored.  Plaintiff's medical records from his intake examinations indicate that PHS medical personnel reviewed plaintiff's medical history, including the extensive list of prescribed medications.  (Doc. 198 exh. D at 855, PHS medical records.) Moreover, the records show that defendant Dayan immediately authorized plaintiff to continue these medications.  Id.  And, as already discussed, the medical records that he attempted to provide to Dr. Dayan in no way suggested that plaintiff was in need of particular cardiac care or specific additional evaluations beyond the prescribed regimen of medications.

Plaintiff alleges that in the months following his transfer to

-14-

Kansas, he complained of severe chest pains to PHS Drs. Boakye, Halvorson, Wengate, and Lu. (Doc. 142 at 1.) Plaintiff also asserts that these doctors filed requests to have him referred to an outside cardiologist for evaluation. Id.

The first request for outpatient referral to a cardiologist was dated February 20, 1998. The request was denominated "Routine," as opposed to "Urgent," and stated that the reason for the referral was simply to follow up on the results of the 1996 thallium scan conducted in Florida. The request conveyed no sense of urgency; nor did it otherwise indicate that the consult was necessary because of some deterioration in plaintiff's condition. (Doc. 198 exh. D at 1113, Outpatient Referral Request Form, Feb. 20, 1998.) Not surprisingly, the request was denied on March 5, 1998, by defendant Ayeni, the PHS regional medical director. His stated reason for denial was that the request provided insufficient information to render a decision. (Doc. 198 exh. D at 879, Outpatient Referral Request Denied, Mar. 5, 1998.)

The next outpatient request form was submitted on June 25, 1998. Again, the form characterized the request as "Routine," and merely provided more details from the 1996 thallium test without suggesting that any change in plaintiff's then-current condition indicated a particular need for a cardiologist consult. (Doc. 198 exh. D at 878, Outpatient Referral Request Form, June 25, 1998.) Plaintiff's medical records indicate that this request was denied on July 2, 1998. (Doc. 198 exh. D at 779, PHS patient notes, July 2, 1998.) That same day, yet another request was submitted. In addition to recounting the results of the 1996 thallium scan, this request also noted that plaintiff was complaining of increased chest pains during exertion.

-15-

(Doc. 198 exh. D at 877, Outpatient Referral Request Form, July 2, 1998.)  The PHS records show that this request was "tabled" at a care management meeting on July 16, 1998.[6]  (Doc. 198 exh. D at 779, PHS patient notes, July 16, 1998.)   PHS records further show that on August 17, 1998, defendant Ayeni stated that the determination regarding the cardiology consult was on hold pending a decision by the Florida Department of Corrections (FDOC) regarding whether to authorize the procedure.   (Doc. 198 exh. D at 1082, Outpatient Referral Flow Sheet, Aug. 13, 1998; id. at 1108, Outpatient Referral Request Denied, Aug. 17, 1998.)   Plaintiff asserts that defendants were requiring the FDOC to pay for the consult, (Docs. 181 at 5; 183 at 14; 198 at 6); nonetheless, Dr. Ayeni's notes state that he would approve the consult in the event of an emergency.  (Doc. 198 exh. D. at 1108, Outpatient Referral Request Denied, Aug. 17, 1998.)

Plaintiff's allegations regarding the issue of who was to pay for his cardiac consultation appear to be born out by a series of communications between KDOC and FDOC.  In a letter dated August 21, 1998, defendant Cummings requested that FDOC approve and pay for plaintiff's requested procedure.  A pair of e-mails were subsequently exchanged between defendant Cummings and FDOC Administrator Robert Porter, culminating in Porter's approving the cardiac consult on November 30, 1998.  (Doc. 198 exh. D, letter from Cummings to Porter, Aug. 21, 1998; id. at 1056, 1107, e-mails between Cummings and Porter,

---

[6] The parties make no effort to describe what was meant by "tabled."  However, this much is clear: unlike the previous requests, this one was not denied.  Moreover, subsequent events suggest that "tabled" merely meant that no decision would be rendered on the request until it was reviewed by the Florida Department of Corrections.

Nov. 30, 1998.)  The e-mail from Porter makes clear that the delay from August to November was due to problems with his staff, not defendants.

Having obtained approval for the consultation, plaintiff was seen on December 15, 1998, by Dr. Michael Mancina, an outside cardiologist in Overland Park, Kansas.  Dr. Mancina reviewed plaintiff's history and symptoms, then recommended various changes in plaintiff's medication.  In addition, Dr. Mancina stated that "considering a thallium stress test at this time would be important." (Doc. 198 exh. C, letter from Dr. Mancina, Dec. 15, 1998.)  Dr. Mancina also telephoned Dr. Dayan about the results of the consultation.  Although Dr. Mancina was "quite concerned" about plaintiff's symptoms, he concluded that plaintiff was not on optimal medications to control his condition.  (Doc. 198 exh. C at 209, letter from Dr. Mancina, Jan. 7, 1999.)  Specifically, Dr. Mancina recommended to Dr. Dayan that plaintiff's "medications be adjusted to increase medical therapy for [his] cardiovascular symptoms in hopes that [those] symptoms could be controlled with medication." Id. Dr. Mancina explained that the goal in treating a cardiac patient like plaintiff is "to maximize medical therapy for coronary artery disease to use medical therapy as long as possible before moving to other forms of treatment as well as to assess the need for that additional treatment in cases of failure of the medicine to control symptoms." Id. Dr. Mancina concluded by observing, "I do believe that, at some point in the future, [plaintiff] will require more intervention than medication.  The question that needs to be answered is whether the time is now or in the not too distant future . . . ." Id. (emphasis added).

-17-

In apparent agreement, and in order to obtain the answer to Dr. Mancina's "question," Dr. Dayan indicated that he would be ordering the thallium scan and implementing the recommended changes in plaintiff's medication. Id. The only evidence in the record that appears to shed any light on whether the medications were actually prescribed is an emergency room referral dated January 14, 1999 (almost a month after plaintiff's first visit with Dr. Mancina). (Doc. 181 exh. D at 1349, Emergency Room Referral, Jan. 14, 1999.) This document listed plaintiff's then-current medications along with dosages. A comparison of this referral sheet with plaintiff's prior medications and dosages as described in Dr. Mancina's letter of December 15, 1998, suggests that plaintiff's prison doctors implemented some of Dr. Mancina's recommended changes, but not others. For example, plaintiff was taking 20 milligrams of Lescol daily prior to December 15. On that day, Dr. Mancina recommended doubling the Lescol dosage to 40 milligrams daily. The referral sheet shows that on January 14, 1999, plaintiff was taking 40 milligrams of Lescol daily, consistent with Dr. Mancina's recommended changes. Similarly, Dr. Mancina recommended doubling plaintiff's Tenormin dosage or, in the alternative, if plaintiff could not tolerate the higher dosage, to supplement the current Tenormin dosage with Cardizem. The January 14 referral sheet shows that, by that date, plaintiff's Tenormin dosage was unchanged, but it was being supplemented with Procardia XL, a Cardizem substitute.

By contrast, a couple of Dr. Mancina's recommendations appeared to go unheeded. For example, plaintiff was taking 60 milligrams of Lasix each morning prior to December 15. During the visit with Dr.

Mancina, he recommended keeping the Lasix dosage at 60 milligrams each morning, with an additional 20 milligrams at night. The January 14 referral sheet shows that on that date, plaintiff was still taking the original dosage of 60 milligrams daily. Similarly, Dr. Mancina's recommendation for changing plaintiff's Isordil dosage appears to have been ignored. Defendants offer no explanation for these apparent discrepancies.

On the other hand, and despite the arguably permissive language used by Dr. Mancina regarding the necessity of a thallium stress test, the uncontroverted evidence shows that Dr. Dayan acted promptly to schedule the thallium scan. (Doc. 198 exh. I at 1097, Regional Approval of thallium test.) By December 21, 1998, less than a week after plaintiff's consultation with Dr. Mancina, defendant Cummings was once again seeking approval from FDOC to proceed with the thallium scan. The FDOC sent its approval on December 28, 1998. (Doc. 198 exh. D at 1099, e-mails between Cummings and Porter dated Dec. 21, 1998 and Dec. 28, 1998.) PHS administrators authorized the procedure that same day. (Doc. 198 exh. I at 1097, Regional Approval.) The approval form specifically noted that Dr. Dayan was the physician requesting the referral. Id.

Plaintiff's thallium stress test was performed on January 14, 1999. The results of the test were described as follows:

> IMPRESSION: We have interpreted the treadmill test as:
> Demonstrating nondiagnostic ST changes inferiorly with exercise.
> Demonstrating good functional capacity.
> Demonstrating effective beta blocker slowing heart rate rise during treadmill.
> Demonstrating good functional capacity on beta blocker and Cardizem.

-19-

(Doc. 198 exh. C at 1347-48, Treadmill Cardiolite Stress Test, Jan. 14, 1999.)  In addition, the radiologic portion of the exam stated as follows:

> IMPRESSION: Findings consistent with reversible ischemia, probably in the distribution of the circumflex.  It appears that there is a small infarct in the interior myocardium as well. Though, there is an element of reversibility of perfusion abnormality in the inferior myocardium.

Id. exh. C at 1345, radiology report, Jan. 15, 1999.  Plaintiff fails to provide any expert witness to interpret these test results, nor does he provide any of the communications between Dr. Mancina and any of the PHS physicians regarding recommended changes to plaintiff's treatment as a result of this test.  Instead, he simply asserts that, as a result of this thallium test, Dr. Mancina recommended that plaintiff have a heart catheterization.  (Doc. 142 at 2.)  However, plaintiff provides no evidence that such a recommendation was made to any of the defendants.

On the contrary, the evidence plaintiff does provide suggests that no such recommendation was ever made.  Plaintiff provides a memorandum from nurse Rinehart to himself in which she notes that she received a report from Dr. Mancina regarding the thallium test; however, the only recommendations from Dr. Mancina referred to in the memorandum are changes in medication.  (Doc. 181 exh. D, memo. from Rinehart to pl., Jan. 21, 1999.)  The next correspondence from Dr. Mancina that is included in the record is a letter dated February 26, 2001, in which the doctor informs plaintiff's wife that, two years having passed since the last thallium scan, he thinks it is time to perform a follow up evaluation, either in the form of another thallium

-20-

test or a stress echocardiogram. (Doc. 198 exh. C at 205, letter from Dr. Mancina to Ana Halpin, Feb. 26, 2001.) Dr. Mancina gives no indication that he ever ordered a heart catheterization or any other procedure as a consequence of the 1999 thallium test. Even a charitable reading of Rinehart's memorandum and this last letter from Dr. Mancina leads to only one conclusion - the only treatment recommended as a result of the thallium test was some adjustments to plaintiff's medications. Plaintiff provides no competent evidence, expert or otherwise, to meet his burden of proving that Dr. Mancina recommended a heart catheterization as a result of this thallium stress test.[7]

Plaintiff alleges that, in the aftermath of his 1999 thallium test, Dr. Dayan "deliberately deleted certain cardiac and pain

---

[7] Throughout this case, and in the prison grievance procedures that preceded it, plaintiff asserts that PHS breached an agreement in which it agreed to provide him with additional medical treatment, including another consultation with Dr. Mancina, in exchange for plaintiff's dismissing his state court case against PHS. (See, e.g., Docs. 13 at 11; 181 at 7; 183 at 9; 198 at 4.) In support of this assertion, he relies on a letter from PHS counsel dated July 29, 1999. However, that letter expressly states that, while local PHS managers were amenable to the settlement, it would have to be approved by PHS executives located out-of-state. (Doc. 198 exh. B.) Prior to seeking that approval, the letter requests that plaintiff confirm his willingness to accept the terms of the settlement as explained in the letter. Plaintiff never points to any response that he provided to PHS counsel, nor does he provide any additional evidence showing that he and PHS ever actually reached a settlement. While he does provide evidence showing that he did dismiss his state case, that evidence is insufficient to show that PHS ever agreed to settle with him.

Ultimately, this argument is simply a distraction from the Eighth Amendment claims that he presents. Any settlement agreement is irrelevant to plaintiff's constitutional claims, amounting to nothing more than a state contract claim. In a prior order, Judge Van Bebber circumscribed the claims remaining in this suit following remand from the Tenth Circuit. (Doc. 12.) That order identified no contract claims. Accordingly, no further consideration will be given to this argument.

medications ordered for me by Dr. Michael S. Mancina." (Doc. 142 at 2.) However, plaintiff fails to specify which medications were deleted. More importantly, plaintiff fails to provide any medical records that show <u>any</u> physician deleted cardiac and/or pain medications. Indeed, by plaintiff's own admission, he has almost 1,600 pages of his medical records, from which he has selected the relevant documents to present as evidence. (Doc. 183 at 7.) Yet, no records substantiating this claim can be found in his submissions. This is not the sort of thing that plaintiff can attest to based on personal knowledge. Even if Dr. Dayan verbally harassed plaintiff by telling him that his medications were being discontinued, these mere words alone cannot amount to a constitutional violation unless they were carried out. Any order to discontinue medications would have been documented in the patient notes, else the nurses, physicians' assistants, and other medical technicians charged with administering the medications would not know that a change had been directed. The lack of documentary evidence makes this a conclusory allegation, which is not sufficient to establish it as fact for purposes of summary judgment.

In his final allegations against Dr. Dayan regarding plaintiff's heart condition, plaintiff asserts that "Dr. Dayan continually denied my request for a cardiac cath[eterization], harassed me by rescinding my various medical passes, and harassed me concerning my wife attempting to get copies of my medical records, and informed me that my chest pains/arthritis pains were all in my head." (Doc. 142 at 2.) Only the first allegation is material, the balance being irrelevant to the claims before the court. Thus, in analyzing plaintiff's

-22-

constitutional claims, the court will consider whether the denial of plaintiff's unilateral requests for a heart catheterization, unsupported by recommendations from qualified physicians, rises to the level of an Eighth Amendment violation.

Those parts of the record to which the parties have directed the court's attention are devoid of any additional evidence regarding the treatment of plaintiff's heart condition until February 2001, when Dr. Mancina sent the letter to plaintiff's wife that was discussed supra. (Doc. 198 exh. C at 205, letter from Dr. Mancina to Ana Halpin, Feb. 26, 2001.)  On May 30, 2001, Dr. Mancina followed up this letter with another one, this time directed to medical officials at the Lansing Correctional Facility.  (Doc. 198 exh. C, letter from Dr. Mancina to LCF medical director, May 30, 2001.)  In the letter, Dr. Mancina recommended that plaintiff's heart condition be re-evaluated, and he requested that LCF medical personnel provide various of plaintiff's medical records in support of that re-evaluation.  Id.  Nothing in Dr. Mancina's letter conveyed in sense of urgency.  Rather, the clear import was that this was a routine followup to see how plaintiff's condition was progressing.

The parties provided no evidence regarding how prison officials and/or prison medical personnel responded to Dr. Mancina's letter. Nonetheless, it is obvious from the record that someone took it seriously because plaintiff was seen by Dr. Mancina on July 19, 2001. (Doc. 198 exh. C, letter from Dr. Mancina to Dr. Naik, Aug. 10, 2001.) As a result of the visit, Dr. Mancina recommended additional modifications to plaintiff's medications, as well as having him take another thallium stress test.  Id.  Dr. Mancina informed defendant Dr.

Naik that plaintiff's "cardiovascular status has worsened <u>but changes</u> <u>should help in controlling his symptoms</u>."[8]  <u>Id.</u> (emphasis added).

Although this visit with Dr. Mancina occurred on July 19, 2001, the letter to Dr. Naik was not typed until August 10, 2001. <u>Id.</u> Soon after receiving the report, Dr. Naik ordered plaintiff seen. (Doc. 148 exh. 3 at 43, dep. of Dr. Naik.)  Plaintiff was seen by Dr. Naik on August 14, 2001, at which time the doctor implemented at least some of the recommended medication changes. <u>Id.</u>  Moreover, it is undisputed that Dr. Naik promptly implemented the recommendation for another thallium scan, which was performed on September 25, 2001.  The procedure report from that test gave the following assessment:

> Arteriosclerotic cardiovascular disease with a mildly positive per ST changes electrocardiogram with dobutamine infusion.  Nuclear study pending.

(Doc. 198 exh. C, Dobutamine sestamibi procedure report, Sept. 25, 2001.)  Plaintiff failed to provide a separate report regarding the results of the nuclear study.  However, he does include a letter from Dr. Mancina to plaintiff's wife dated November 7, 2001, in which the doctor gives some assessment of the thallium test.  (Doc. 198 exh. C at 206, letter from Dr. Mancina to Ana Halpin, Nov. 7, 2001.)  While leaving out some of the details about the test, Dr. Mancina characterized it as "a true positive" that was "consistent with multivessel coronary artery disease and ischemia in more than one area in the heart."  <u>Id.</u>  Dr. Mancina's recommendations in light of the thallium test were limited to the following:

---

[8] The evidence suggests that defendant Dr. Naik took over a substantial amount of plaintiff's medical care after Dr. Dayan left PHS.

-24-

> [W]e would be happy to see [plaintiff]
> periodically and I would be happy to see him in
> follow up in the next month so I can make further
> recommendations and adjustments in medication if
> his blood pressure is not controlled or if his
> symptoms are out of control.
>     The fact that he has a positive thallium
> scan in more than one location needs to be
> correlated with his current symptoms and his
> current response to medication, his blood
> pressure and his heart rhythm <u>before making any
> further recommendations</u>.

<u>Id.</u> (emphasis added).  Plaintiff failed to provide a copy of any correspondence between Dr. Mancina and his prison doctors that relates to this stress test.  Having nothing but this last letter as evidence of the recommended treatment, it is clear that Dr. Mancina merely suggested observing plaintiff's symptoms and response to medications over time before making any determinations regarding more invasive procedures.

At this point in the chronology, the treatment of plaintiff's heart condition begins to coalesce, and to some degree, conflict with treatment of his sinus condition and his skin infection.  Therefore, the court will shift to recount the history of those matters up until the point that it makes sense to begin discussing the interrelation between all the care being provided.

2.  Sinus Condition

Plaintiff alleges that he had a severe sinus infection beginning in March 2001.  (Docs. 13 at 21; 198 at 8.)  He claims that on March 28, 2001, he was seen for this condition by a physician's assistant who prescribed an antibiotic and ordered x-rays and blood tests. Plaintiff asserts that he saw Dr. Naik a number of times between May 2001 and July 2001, but that Dr. Naik diagnosed him with hay fever and

otherwise refused to treat him.  Then on August 1, 2001, plaintiff claims he was see by another physician's assistant (PA) who examined his sinus cavities with an instrument.  The PA allegedly took x-rays that "revealed a massive infection and a lot of puss and mucus." (Doc. 13 at 21.)  Consequently, the PA once again prescribed plaintiff an antibiotic.  Id.

Plaintiff then alleges that he saw Dr. Naik on August 14, 2001, at which time the doctor disagreed with the PA's diagnosis, relying instead on the former diagnosis of hay fever.  Plaintiff alleges that Dr. Naik discontinued the antibiotic that the PA had previously prescribed.  Nonetheless, on August 21, 2001, plaintiff was once again seen by the PA.  This time, the PA took another x-ray, which he showed to Dr. Naik.  The doctor then concurred with the PA's conclusion that plaintiff suffered a sinus infection and prescribed an appropriate antibiotic.  Id. at 21-22.

The problem with all these allegations regarding plaintiff's sinus condition is that they are largely unsupported by any objective evidence.  Given that plaintiff's complaint was signed under penalty of perjury, id. at 56, the court accepts the allegations that he suffered discomfort from March 2001.  Nevertheless, and despite the fact that he has included numerous medical records related to his heart condition, plaintiff failed to include any medical records to substantiate any of his assertions up until August 21, 2001.  Thus, the court rejects any allegations for which plaintiff lacks personal knowledge and/or expertise that would allow him to testify.

Accordingly, for purposes of the pending motions, the facts leading up to and including the August 21, 2001 visit with the PA are

-26-

as follows: Plaintiff suffered severe sinus pain beginning in March 2001. On March 28, 2001, he saw a PA who, by plaintiff's own admission, treated him with antibiotics and ordered up other tests. Plaintiff saw Dr. Naik on three occasions between May 8, 2001 and July 11, 2001. On May 8, Dr. Naik stated that plaintiff was merely suffering hay fever; and on the other two occasions, the doctor refused to discuss the sinus problems, although he did treat plaintiff for other maladies during those visits. Nevertheless, there is no indication that Dr. Naik ever discontinued the antibiotic regimen prescribed by the PA during the March visit. Thus, even if Dr. Naik was rude or unaccommodating to plaintiff, there is no evidence that he otherwise interfered with ongoing treatment. (Doc. 13 at 21.)

On August 1, 2001, plaintiff saw the second PA; however, plaintiff offers no evidence regarding that visit or the diagnosis rendered, if any. However, plaintiff does admit that the PA treated him with a two-week regimen of antibiotics. On August 14, 2001, plaintiff saw Dr. Naik, who may have disagreed with the PA's assessment.[9] The court will not credit plaintiff's allegation that Dr. Naik discontinued his antibiotic for two reasons: First, by plaintiff's own admission, the PA's prescription was only for two weeks and expired by its own terms; and, second, any medication orders would have been documented in the patient notes or charts so that

_____

[9] For purposes of keeping the entirety of plaintiff's treatment in context, the court notes that this was the same visit in which Dr. Naik reviewed the results of plaintiff's July 19, 2001 cardiac consult with Dr. Mancina. Plaintiff's second thallium scan was then performed on September 25, 2001, during the same time period in which plaintiff was being seen on numerous occasions for sinus x-rays, prescriptions, etc. See infra, discussion of plaintiff's sinus treatments in September and October 2001.

those responsible for dispensing medications would be aware of the change. Since plaintiff failed to provide evidence of a change order regarding antibiotics, his allegation that Dr. Naik discontinued his medications is conclusory. Id. at 21-22.

Plaintiff was seen by the PA again on August 21, 2001. Plaintiff claims that he was x-rayed and that, on the basis of that x-ray, Dr. Naik agreed with the PA's diagnosis. Once again, however, plaintiff fails to provide evidence of the diagnosis or any orders entered by any care provider. The once piece of evidence that he does provide is ambiguous. It is a radiology report on his sinuses ordered up by the PA on August 21, 2001. The radiologist concluded that plaintiff suffered "[a]cute frontal sinusitis," and "[s]evere left ethmoid and maxillary sinusitis." (Doc. 198 exh. K at 1503, radiology report, Aug. 21, 2001.) Plaintiff provides no evidence as to what these diagnoses mean, so the court relies on an available reference to help decipher them. Sinusitis is an "inflammation of a sinus." Taber's Cyclopedic Medical Dictionary 1899 (19th ed. 2001). It may or may not involve an infection. Id. Accordingly, there is a lack of evidence to substantiate plaintiff's claim that he suffered an actual sinus infection up to this point in time. Rather, the evidence shows that he suffered considerable sinus pain, and that his prison healthcare providers treated his condition with antibiotics from the time of onset through August 21, 2001.

Plaintiff alleges that he was seen again by the PA on September 21, 2001, at which time the PA continued treating him with antibiotics. He claims that the PA ordered up more x-rays, and that Dr. Naik reviewed the results of those films with him on October 3,

-28-

2001.  Plaintiff claims that Dr. Naik told him the radiology report showed a mass inside his sinuses.  However, that assertion is contradicted by the only evidence plaintiff provided on this subject. A radiology report dated September 21, 2001, noted improvement in his sinus condition, but makes no reference to any mass therein.  (Doc. 198 exh. K at 1502, radiology report, Sept. 21, 2001.)  Plaintiff also claims that Dr. Naik promised to refer plaintiff to an outside Ear, Nose, and Throat (ENT) specialist.  (Doc. 13 at 22.)

Consistent with this last assertion, the evidence shows that five days after Dr. Naik promised to refer plaintiff to an ENT specialist, PHS approved the referral to Dr. Benesto Tumanut.  (Doc. 198 exh. K at 1528, Regional Approval, Oct. 8, 2001.)  Although plaintiff produced no documentation from the visit with Dr. Tumanut, plaintiff did produce a letter from the doctor in which he summarized his findings and recommendations.  (Doc. 198 exh. K, letter from Dr. Tumanut, July 14, 2005.)  Plaintiff was seen by Dr. Tumanut on October 31, 2001.  Dr. Tumanut diagnosed plaintiff with "chronic/acute pansinusitis and a deviated nasal septum."  Id.  The doctor also recommended to the Lansing physicians that plaintiff be scheduled for endoscopic sinus surgery and nasal septal reconstruction.  Id.

In response to that recommendation, defendant Dr. Baker, who was then the PHS medical director, denied the request for surgery.  As his reason for denial, Dr. Baker said:

> I would like to try one more thing before going
> to surgery.  I would approve and suggest him
> being on Levoquin 500mg daily x 14 days and
> repeating an x-ray of his sinuses 1-2 weeks after
> completing the antibiotic. If this doesn't work,
> as seen by objective findings, then lets [sic]
> get the surgery.

-29-

(Doc. 198 exh. K at 1522, Outpatient Referral Request Denied, Nov. 19, 2001.)   The record suggests that Dr. Baker's plan was followed. Plaintiff was seen on November 27, 2001 by a nurse who noted Dr. Baker's suggestions and forwarded plaintiff's case to Dr. Naik for further treatment.   (Doc. 198 exh. K at 526, progress note, Nov. 27, 2001.)   Although it does not appear that the doctors waited the three to four weeks suggested in Dr. Baker's note, plaintiff once again underwent sinus x-rays on December 3, 2001.   Those x-rays were interpreted as showing "progression of the sinus disease since 8/21/2001." (Doc. 198 exh. K at 178, radiology report, Dec. 3, 2001.) Then, on January 8, 2002, PHS granted approval for Dr. Tumanut's recommended surgical procedures.   Consistent with his previous plan, Dr. Baker stated as his reasons for approval that

> this is an appeal of a previous referral requesting endoscopic sinus debridement by Dr. Benesto Tumanut[.]   Inmate was treated with Levoquin with out [sic] noticable [sic] improvement of his symptoms.   Continues to have sinus drainage green in color.

(Doc. 198 exh. K at 1519, regional approval, Jan. 8, 2002.)

Plaintiff presented to Dr. Tumanut on January 23, 2002 for the approved surgery.   However, during his pre-operative work-up, "the anesthesia department recommended that because of [plaintiff's] previous cardiac problems[,] plaintiff [was] not a suitable candidate for an <u>elective surgery</u>." (Doc. 198 exh. K, letter from Dr. Tumanut, July 14, 2005 (emphasis added).)   Thus, although plaintiff did not then receive the recommended surgery, the very doctor who recommended it characterized the procedure as elective, rather than necessary or mandatory.

-30-

Plaintiff was next seen by Dr. Naik on February 7, 2002. According to the patient notes from that visit, Dr. Naik decided to refer plaintiff to a different ENT specialist for a second opinion. (Doc. 198 exh. K at 1517, Outpatient Referral Request Form, Feb. 7, 2002.) In his notes from that visit, Dr. Naik stated that he did not

> see any medical necessity for the cardiac catherization [sic] prior to this [sinus] surgery. Even though the myocardial perfusion scan was reportedly abnormal, [plaintiff] does not have frequent chest pains. Will refer [plaintiff] to another ENT surgeon. If [the surgeon] insists on card. cath prior to surgery, then we will go ahead with it.

(Doc. 198 exh. K, patient notes, Feb. 7, 2002.) The referral was approved on February 26, 2002, and plaintiff was seen by ENT specialist Dr. Steven Ranzenberger on March 25, 2002. (Doc. 198 exh. K at 1516, regional approval, Feb. 26, 2002; id. at 1543-44, letter from Dr. Ranzenberger, Mar. 25, 2002.) Dr. Ranzenberger recommended a one-month treatment regimen consisting of an alternative antibiotic coupled with nasal irrigation using saline solution. Id. This treatment would be followed up with another x-ray to evaluate its efficacy. If the condition persisted, Dr. Ranzenberger opined that he could perform surgery under local anesthesia, thereby avoiding the complications between general anesthesia and plaintiff's cardiac condition. Id.

PA Ron Egli promptly prescribed the antibiotic that Dr. Ranzenberger recommended. (Doc. 198 exh K at 420, progress note, Mar. 25, 2002.) Apparently, the treatment was not effective because, on April 18, 2002, consistent with Dr. Ranzenberger's recommendations, Dr. Naik ordered a CT scan of plaintiff's sinuses. (Doc. 198 exh K,

-31-

radiology report, Apr. 18, 2002.)  On April 22, 2002, Dr. Naik submitted a referral request to have Dr. Ranzenberger perform the endoscopic sinus surgery.  (Doc. 198 exh. K at 518, progress note, Apr. 22, 2002.)  The request was apparently approved and the surgery was scheduled for the week of May 13, 2002.  (Doc. 198 exh. K at 416, progress note, May 10, 2002.)  Nevertheless, and having gone through so much effort in order to get the surgery, plaintiff refused the scheduled procedure based on his lack of confidence in Dr. Ranzenberger as well as advice from his attorney.  (Docs. 164 at 4 ¶ 14; 183 at 3.)

At this point, it is once again appropriate to digress and recount the history of plaintiff's skin infection and how it played into his overall treatment.

3.  Skin Infection

Plaintiff's allegations regarding his skin problems are sketchy and, for the most part, poorly supported by the evidence.  His first mention of skin problems is on September 21, 2001.  (Doc. 13 at 22.) He repeats his complaints in October and December 2001, but each of these allegations is expressed in boilerplate language coupled with his sinus complaints. A typical examples is, "after suffering severe sinus pain, severe headaches, severe eye aches, painful sores and lesions, and sever [sic] hair loss . . . ." (Doc. 13 at 23.)  In all but one of these allegations, plaintiff goes on to complain of his sinus condition, not his skin problems.  However, plaintiff provides no progress notes or other documentary evidence to show that he sought treatment during this time period, even though he admits that some healthcare providers prescribed antibiotics for his condition.  Id.

Nevertheless, beginning on February 7, 2002, plaintiff's medical records begin to show evidence that he was being treated for his skin malady. On that date, one document shows that he was prescribed hydrocortisone cream to be applied topically to his skin. (Doc. 198 exh. K, chronic care notes, Feb. 7, 2002.) Plaintiff asserts that he was seen by PA Ron Egli on March 4, 2002, but that the PA could not prescribe any medications based on Dr. Naik's orders. (Doc. 13 at 24.) Inconsistent with that assertion, however, is plaintiff's admission that, following his March 25, 2002, visit with Dr. Ranzenberger, he once again saw PA Egli, who prescribed an antibiotic and pain medication for plaintiff's skin condition. (Doc. 13 at 25.) Plaintiff presents no evidence to support either version of the facts. Plaintiff complains that he was also seen in April 2002, but nothing was done for him. Then, on May 9, 2002, Dr. Naik prescribed him prednisone pills and a topical cream. (Doc. 198 exh. K at 332, chronic care note, May 9, 2002.)

4.   All Maladies from May 2002 Forward

As a matter of quick review, the court's summary of the facts surrounding plaintiff's heart condition ended with Dr. Mancina's letter of November 7, 2001, in which he recommended further medication and evaluation of plaintiff's symptoms. See supra, Part III.B.1. This recommendation was made in light of plaintiff's second thallium stress test conducted in September 2001. See id. Other than giving an example of a time when he suffered chest pains, plaintiff makes no further allegations regarding his heart condition in 2001. (See Doc. 13 at 15.) Plaintiff alleges that he complained of chest pain to Dr. Naik during a visit on February 7, 2002, but was given no additional

-33-

relief.   (Docs. 13 at 15; 198 exh. K, chronic care note, Feb. 7, 2002.)  He makes a similar complaint on May 9, 2002.  (Doc. 13 at 16.)

During this same time frame, plaintiff was seen numerous times for his sinus condition.  This treatment culminated in plaintiff's refusing the scheduled endoscopic sinus surgery sometime during the week of May 13, 2002.  <u>See supra</u>, Part III.B.2.  And, as just previously discussed, plaintiff had been seen a number of times for his skin problems, which were being treated with both oral antibiotics and topical creams.  <u>See supra</u>, Part III.B.3.

On May 21, 2002, on the heels of plaintiff's having refused his sinus surgery, he was seen by Dr. Baker in an effort to chart a new course of treatment for his heart and sinus problems.  (Doc. 198 exh. I at 1507, progress note, May 21, 2002.)  In his notes, Dr. Baker indicated that he wanted plaintiff referred back to cardiology and that he would approve a request for a heart catheterization.  <u>Id.</u>  A nurse's note dated May 24, 2002, acknowledged Dr. Baker's orders and stated that a cardiology consult was being scheduled with "Kansas Cardiovascular."  (Doc. 198 exh. I at 515, progress note, May 24, 2002.)

While there is no documentary evidence showing the next step in plaintiff's cardiac treatment, plaintiff admits that he was seen by an outside cardiologist, Dr. Ashwan Mehta, on June 10, 2002.  Upon learning that Dr. Mehta was friends with Dr. Naik, that both were from India, and after listening to Dr. Mehta, "[p]laintiff refused any further medical treatment from Dr. Mehta."  (Doc. 13 at 16.)

On that same day, June 10, 2002, plaintiff was also seen by Dr. Naik regarding complications with his sinus condition.  As a natural

-34-

consequence of plaintiff's stubborn refusal to undergo the sinus surgery he had so desperately sought, his sinus infection spread to his ears. Dr. Naik prescribed both oral and topical antibiotics. (Doc. 198 exh. K at 413, progress note, June 10, 2002.) He was seen again by Dr. Naik on June 20, 2002. The progress notes show some improvement in the affected ear, but also show that the other ear was developing symptoms. (Doc. 198 exh. K at 411, progress note, June 20, 2002.) The notes also show that Dr. Naik reiterated the need for sinus surgery in order to correct plaintiff's sinus-related conditions.

At about the same time, the record shows improvement in plaintiff's skin condition. During the same June 20, 2002, visit with Dr. Naik the progress notes read,

> The skin lesions are a lot better now. No other complaints except chronic sinus congestion and pressure.

(Doc. 198 exh. K at 411, progress note, June 20, 2002.) The notes also show that the prednisone prescription was continued for at least another month. Id.

At some point thereafter, the record indicates that Dr. Naik ceased to be plaintiff's primary caregiver, that honor having been passed on to Dr. Carlos Petit. (Doc. 198 exh. I at 266, report, Aug. 8, 2002.) Plaintiff unabashedly takes credit for this, suggesting that it was complaints through his attorney that led to Dr. Naik's professional demise. (Doc. 13 at 26-27.) As usual, plaintiff puts forth no evidence on this fact. It is just as well, since the matter is immaterial.

In any event, plaintiff was seen by Dr. Petit on August 30, 2002,

-35-

regarding his skin problems. Dr. Petit diagnosed plaintiff with bacterial folliculitis and prescribed an oral antibiotic and a topical cream. (Doc. 198 exh. L at 407, progress note, Aug. 30, 2002.) He was seen again by a nurse on September 18, 2002, at which time he complained that the antibiotic was not helping, and his condition was worsening. (Doc. 198 exh. L at 617, progress note, Sept. 18, 2002.)

During the summer of 2002, the record is a bit unclear regarding the plan for plaintiff's heart treatment. Despite the fact that plaintiff refused treatment from the cardiologist, Dr. Mehta, in June, his complaint suggests that plans were still in the works to obtain a heart catheterization. (Doc. 13 at 17.) Plaintiff credits Dr. Petit with having promised to check into the catheterization plans. Id. Plaintiff further claims that, on August 30, 2002, Dr. Petit informed him that he could not have the catheterization until his skin infection improved. Id. Plaintiff restates this assertion on September 20, 2002. Id. However, plaintiff's allegation is not born out by the evidence.

On the contrary, the progress notes from the September 20, 2002 visit with Dr. Petit shows that plaintiff was seen for the purpose of reviewing his heart, sinus, and skin problems. (Doc. 198 exh. K at 404, progress note, Sept. 20, 2002.) The note shows Dr. Petit recommended that plaintiff receive his heart catheterization from Kansas Cardiovascular Associates, after which plaintiff would have his sinus surgery. Id. Nevertheless, a subsequent note shows that on September 24, 2002, just four days after plaintiff was approved for the very treatment he had been demanding, and in the precise order plaintiff felt it should be scheduled, plaintiff submitted a document

-36-

formally refusing the scheduled cardiac catheterization. (Doc. 198 exh. I, progress note, Oct. 8, 2002.) Plaintiff confirmed the accuracy of this statement in his own brief. (Docs. 165 at 4; 183 at 3.)

Despite plaintiff's audacity, his prison doctors continued to suffer his foolishness. The record shows that, on December 4, 2002, plaintiff was seen by yet another cardiologist, Dr. Jose Dulin. (Doc. 198 exh. I at 213, office consultation note, Dec. 4, 2002.) The note shows that plaintiff was referred by the then-current PHS medical director, Dr. Danny Stanton. Id. Dr. Dulin concluded that plaintiff would benefit from the cardiac surgery. Nonetheless, he noted that plaintiff only suffered angina during heavy physical exertion, and that plaintiff was otherwise "relatively stable." Id. As a result, Dr. Dulin concluded that it would be inappropriate to perform the heart surgery until plaintiff's skin condition improved. Id.

Dr. Dulin's observations were noted by a PHS nurse on December 9, 2002, and he was seen for a followup with Dr. Stanton on December 12, 2002. (Doc. 198 exh. I at 507, progress note, Dec. 9, 2002; exh. L at 397, progress note, Dec. 12, 2002.) During this visit, the doctor noted some improvement in the skin infection and determined to continue the current antibiotic regimen, with cardiac catheterization to follow. (Doc. 198 exh. L at 397, progress note, Dec. 12, 2002.) Thus, at this point in plaintiff's treatment, his maladies had been prioritized such that the first ailment that required correction was the skin infection, after which plaintiff would undergo cardiac catheterization; then he would be able to complete the endoscopic sinus surgery.

Plaintiff followed up with Dr. Stanton on December 27, 2002. (Doc. 13 at 19.) During that visit, Dr. Stanton determined that it was appropriate to refer plaintiff to an outside skin specialist. (Doc. 198 exh. K, outpatient referral request form, Dec. 27, 2002.) That request was approved on January 8, 2003. Id.

Plaintiff was seen by an infectious disease consultant, Dr. Vivek Sahgal, on February 18, 2003. (Doc. 198 exh. L at 211, letter from Dr. Sahgal, Feb. 13, 2003.) Dr. Sahgal reviewed plaintiff's history and prescribed a different antibiotic for his skin infection. Id. A followup visit on June 24, 2003 showed that plaintiff's skin problems had largely been resolved. (Doc. 198 exh. L, letter from Dr. Sahgal, June 24, 2003.) Dr. Sahgal continued oral and topical medications to treat the remaining skin irritations. Id.

Plaintiff provides scant evidence of events during the summer of 2003. The record does show that on or about August 8, 2003, Dr. Stanton faxed a request to FDOC seeking approval for plaintiff's cardiac catheterization. (Doc. 198 exh. I, fax, Aug. 8, 2003.) The next page in the record shows that FDOC responded to that fax, noting that the procedure had been "verbally approved," and requesting some additional information. (Doc. 198 exh. I, fax, Aug. 12, 2003.)

Apparently, the remainder of any formal approvals was received, because on September 2, 2003, plaintiff underwent cardiac catheterization by Dr. Dulin. (Doc. 198 exh. C, procedure report, Sept. 2, 2003.) The catheterization revealed a number of coronary blockages for which Dr. Dulin recommended surgery. Id. In prompt response to these results, Dr. Stanton submitted a referral request for cardiac bypass surgery. (Doc. 198 exh. E, outpatient referral

-38-

request form, Sept. 3, 2003.)

The record shows that plaintiff was seen a number of times during the months of September and October regarding his surgery and his skin problems. (Doc. 198 exh. E, progress notes, Sept. 5, 11, 12, 26, Oct. 10 and 24.)  The notes from these visits indicate that plaintiff's heart surgery was pending approval.  They also show that plaintiff's skin problems flared up, but then abated.  Dr. Stanton's notes further show that plaintiff was informed that his skin condition was not serious enough during this episode to interfere with his heart surgery.  See id.  Finally, the notes show that on December 9, 2003, plaintiff formally documented his refusal of the requested bypass surgery. (Doc. 198 exh. E, progress note, Dec. 9, 2003.)  The note suggests that plaintiff believed he could get the surgery done quicker by transferring back to Florida.  Id.  It did not take long for the transfer to occur, as the record shows that plaintiff left the Lansing Correctional Facility on December 24, 2003, and was back in a Florida prison by January 2004.  (Docs. 39; 142 at 1.)

Plaintiff states that he received the necessary bypass surgery in February 2004. (Doc. 183 at 9.)  He further alleges that, due to the delays caused by the various defendants in obtaining the surgery, some of his blockages had calcified.  Id. at 9-10.  However, plaintiff provides no evidence that he had this surgery, nor does he provide evidence of the results of the procedure.  Accordingly, the court does not credit his assertions that delays occasioned by defendants reduced the efficacy of any subsequent treatments.

Based on the foregoing facts, plaintiff brings an action against defendants under 42 U.S.C. § 1983.  He asserts that the Medical

Defendants were deliberately indifferent to his serious medical needs, thereby violating his Eighth Amendment right to be free from cruel and unusual punishment.  He further claims that the KDOC Defendants were deliberately indifferent to his serious medical needs based on their handling of his grievances related to his medical care.  Plaintiff's complaint may also be interpreted as attempting to state claims for medical malpractice under state law.

C.  Analysis of Summary Judgment Motions

The Eighth Amendment to the United States Constitution prohibits the infliction of "cruel and unusual punishments."  U.S. Const. Amend. VIII.  Deliberate indifference to a prisoner's serious medical needs "constitutes the unnecessary and wanton infliction of pain . . . proscribed by the Eighth Amendment."  Estelle v. Gamble, 429 U.S. 97, 104, 97 S. Ct. 285, 291, 50 L. Ed. 2d 251 (1976) (citations and internal quotation marks omitted).

Deliberate indifference to a prisoner's serious medical needs encompasses two components.  Mata v. Saiz, 427 F.3d 745, 751 (10th Cir. 2005) (citing Sealock v. Colorado, 218 F.3d 1205, 1209 (10th Cir. 2000)).  First, there is an objective component, which requires that the medical need be sufficiently serious.  Id.

> We have said that a "medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  Sealock, 218 F.3d at 1209 (quoting Hunt v. Uphoff, 199 F.3d 1220, 1224 (10th Cir. 1999) (further quotation omitted)).  Where the necessity for treatment would not be obvious to a lay person, the medical judgment of the physician, even if grossly negligent, is not subject to second-guessing in the guise of an Eighth Amendment claim.  See, e.g., Green v.

> Branson, 108 F.3d 1296, 1303 (10th Cir. 1997).
> Moreover, a delay in medical care "only
> constitutes an Eighth Amendment violation where
> the plaintiff can show the delay resulted in
> substantial harm." Oxendine v. Kaplan, 241 F.3d
> 1272, 1276 (10th Cir. 2001) (quotation omitted).
> The substantial harm requirement "may be
> satisfied by lifelong handicap, permanent loss,
> or considerable pain." Garrett v. Stratman, 254
> F.3d 946, 950 (10th Cir. 2001).

Id. (emphasis added).

The second part of the deliberate indifference test involves a subjective component. The question is whether the defendant had a sufficiently culpable state of mind. Id. (citing Estelle, 429 U.S. at 106, 97 S. Ct. 285).

> The subjective component is satisfied if the
> official "knows of and disregards an excessive
> risk to inmate health or safety; the official
> must both be aware of facts from which the
> inference could be drawn that a substantial risk
> of serious harm exists, and [he] must also draw
> the inference."

Id. (quoting Farmer v. Brennan, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L. Ed. 2d 811 (1994)).

Tenth Circuit law recognizes two ways in which a defendant's conduct may amount to deliberate indifference. Sealock, 218 F.3d at 1211. "First, a medical professional may fail to treat a serious medical condition properly." Id. Alternatively, a prison official may prevent an inmate from receiving treatment or from seeing medical personnel who are capable of evaluating his need for treatment. Id.

> Ordinarily, a medical professional will not be
> liable for this second kind of deliberate
> indifference, because he is the person who
> provides the treatment. If, however, the medical
> professional knows that his role in a particular
> medical emergency is solely to serve as a
> gatekeeper for other medical personnel capable of
> treating the condition, and if he delays or

-41-

> refuses to fulfill that gatekeeper role due to
> deliberate indifference, it stands to reason that
> he also may be liable for deliberate indifference
> from denying access to medical care.

Id. (emphasis added).

Under the first theory, failure to properly treat plaintiff's serious medical condition, a doctor may be liable under the Eighth Amendment when he chooses "easier and less efficacious treatment" if the deviation is so gross as to fall outside the bounds of professional judgment. Estelle, 429 U.S. at 104 n.10, 97 S. Ct. at 291 (quoting Williams v. Vincent, 508 F.2d 541 (2d Cir. 1974)). However, the case cited by the Supreme Court in support of that proposition involved a prisoner who had his ear cut off by a fellow inmate. Williams, 508 F.2d at 543. Rather than attempt to reattach the ear, medical personnel informed the prisoner that he did not need the ear and threw it in the trash as the patient looked on. Id. Absent such extreme circumstances, "a mere difference of opinion between the prison's medical staff and the inmate as to the diagnosis or treatment which the inmate receives does not support a claim of cruel and unusual punishment." Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir. 1980). More precisely, when that difference of opinion centers around the need to involve an outside medical specialist, the decision is ordinarily one grounded in professional medical judgment and is not actionable under the Eighth Amendment. Franklin v. Kansas Dept. of Corr., No. 05-3166, slip op. at 4 (10th Cir. Dec. 23, 2005) (citing Ledoux v. Davies, 961 F.2d 1536, 1537 (10th Cir. 1992); Estelle, 429 U.S. at 107 (the "question whether ⋯ additional diagnostic techniques or forms of treatment [are] indicated is a classic example of a matter

-42-

for medical judgment")); but see, Oxendine, 241 F.3d at 1278 (noting that the decision not to refer inmate to a specialist might be actionable if the need was obvious to a layperson). Furthermore, deliberate indifference involves a higher standard than mere medical malpractice. Indeed, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle, 429 U.S. at 106, 97 S. Ct. at 292.

In this case, the Medical Defendants concede that plaintiff's alleged maladies amount to serious medical needs. (Doc. 165 at 7.) Accordingly, the court sees no need to dwell on whether plaintiff's alleged medical needs were his heart, sinus, and skin conditions, the pain emanating therefrom, or both. See Mata, 427 F.3d at 753 (holding that the harm may be either the underlying health problem or the pain experienced because of that problem); but see id. at 763-64 (Baldock, J., dissenting) (observing that the majority holding "swe[pt] away twenty-five years of binding precedent as 'dicta' and effectively relieve[d] a prisoner claiming deliberate indifference to her medical needs of the burden of satisfying the objective prong of the deliberate indifference test"). The only question before the court is whether any of the Medical Defendants were deliberately indifferent to any of these serious medical needs.[10]

Turning to the subjective component, the court first notes that plaintiff has put forth no evidence that any of the Medical Defendants were "solely" acting as gatekeepers. Sealock, 218 F.3d at 1211. All

---

[10] The court notes, however, that in his brief, plaintiff expressly characterized his "serious medical needs" as his "cardiac, sinus and skin conditions," rather than the pain resulting therefrom. (Doc. 183 at 4.)

but one of the Medical Defendants were medical doctors who were, to one degree or another, directly involved in examining plaintiff and/or approving requests for outside consultations.  There has been no evidence that medical doctors in general, or these doctors in particular, lacked the technical or professional qualifications to treat plaintiff's conditions.  Accordingly, the court finds that they were not merely gatekeepers, but were treating doctors whose decisions are immune to an Eighth Amendment challenge unless those decisions fell outside the bounds of professional judgment.  Id.  Stated another way, the only way these defendants may be liable for deliberate indifference is if they "fail[ed] to treat a serious medical condition properly."  Id.  As to the remaining medical defendant, Ms. Goehring, the only allegations against her relate to her role in responding to plaintiff's charges in the prison grievance system.  (Doc. 13 at 32-39.)  The court reserves discussion of claims against Ms. Goehring until later in this order.

    1.  Defendant Dr. Stephen Dayan

    Dr. Dayan began treating plaintiff almost immediately after the latter's arrival in the Kansas prison system.  Contrary to plaintiff's repeated assertions, he did not arrive from Florida with a doctor's recommendation for heart surgery.  Instead, he presented to Dr. Dayan with a known history of cardiovascular problems punctuated by some ambiguous, and arguably unrelated, treatment suggestions.

    In particular, he had records from a three-year-old heart catheterization that suggested bypass surgery might be appropriate if plaintiff failed to respond to medication.  (Doc. 181 exh. A at 904, medical procedure report, Jan. 31, 1994.)  Plaintiff also had records

-44-

from two doctors who saw him regarding gastro-intestinal problems, one of whom recommended a thallium scan to determine if his heart was strong enough to undergo the gastro-intestinal treatment.  (Doc. 181 exh. A at 912-13, physician's note, May 3, 1996.)  If the outcome of the thallium test was bad, the doctor recommended another heart catheterization.  Id.  Finally, plaintiff produced a report of the recommended thallium scan, but offered no evidence interpreting the results, nor any evidence suggesting that the Florida doctor who requested the thallium scan acted upon it by requesting a cardiac catheterization.  (Doc. 198 exh. A at 914, medical procedure report.)

Dr. Dayan first saw plaintiff over a year after his last documented thallium scan in Florida.  Even assuming that he provided the doctor with the Florida medical records just discussed, the court finds that these scant records fail to mandate any particular course of treatment.  The records from 1996 show only that the Florida doctors thought his heart condition should be checked before proceeding with his gastro-intestinal treatment.  As discussed previously, plaintiff amended his complaint to remove gastro-intestinal problems as a basis for an Eighth Amendment claim.  The Florida records fail to convey any independent sense of concern regarding plaintiff's heart condition.  The lack of any additional records after the 1996 thallium test suggests that his Florida doctors were satisfied with his cardiac status at the time.

The evidence shows that defendant Dayan reviewed plaintiff's medical history shortly after the latter's arrival in Kansas.  Dr. Dayan continued the medications that plaintiff had been prescribed in Florida.  The evidence further shows that, beginning in early 1998,

other PHS doctors (who apparently were also seeing plaintiff) began making a series of "routine" requests to refer plaintiff out for consultation with a cardiologist.  The documentation on the early requests was inadequate, and were appropriately denied.  Once the requesters (who appeared to be different individuals each time) supplied the necessary information, the request was processed and ultimately approved in November;[11] however, three months of the delay in obtaining approval was caused by mixups with the FDOC administrators, and is thus not attributable to any defendant.

Plaintiff was seen for his cardiac consultation by Dr. Mancina in December 1998.  As a result of that visit, Dr. Mancina recommended some changes to his medications, as well as anther thallium stress test.  The evidence shows that Dr. Dayan implemented the majority of the medication changes and promptly scheduled the recommended thallium test, which was performed in January 1999.  There is no evidence that Dr. Mancina ordered any additional treatment as a result of the thallium scan.  Thus, the net result of this series of visits with cardiac specialists was minor changes to plaintiff's medications.

This last fact is most enlightening because, throughout his numerous filings and briefs, it is apparent that plaintiff holds Dr. Mancina in high esteem.  Yet, Dr. Mancina essentially recommended continuing the treatment regimen that Dr. Dayan had in place for the previous eighteen months.  Accordingly, the court is at a loss to understand how Dr. Dayan's treatment could be considered so inadequate as to offend the constitution when it was, in all apparent respects,

---

[11]  Notably, the personnel requesting the referrals are not defendants in this case.

-46-

virtually the same as that recommended by plaintiff's chosen specialist. Plaintiff has failed to assist the court by offering any expert testimony to parse the differences between Dr. Dayan's treatment and Dr. Mancina's recommended treatment.[12] Plaintiff must bear responsibility for that evidentiary shortfall.

Plaintiff also charges that defendant Dayan violated the Eighth Amendment by refusing to schedule the heart catheterization that

_____

[12] The Medical Defendants urge the court to categorically rule that plaintiff's Eighth Amendment claims must fail for lack of expert testimony. (Doc. 165 at 9.) However, those defendants fail to cite a single case for the proposition that an Eighth Amendment claim against a doctor necessarily requires expert testimony. Instead, Medical Defendants unilaterally assert that expert testimony is required and then begin citing state medical malpractice cases for the relevant standards. Id. at 9-11.

The court was unable to find any cases that categorically mandate expert testimony in an Eighth Amendment claim against prison doctors. The Medical Defendants cite Medcalf v. Kansas, 626 F. Supp. 1179, 1182 (D. Kan. 1986) for this proposition, but the case does not so hold. (Doc. 165 at 10.) Medcalf merely states that, "To constitute cruel and unusual punishment, improper or inadequate medical treatment must be continuing, must not be supported by any competent, recognized school of medical practice, and must amount to a denial of needed medical treatment." 626 F. Supp. at 1182. The Medical Defendants interpret this standard as mandating expert testimony. While expert testimony may undoubtedly be helpful, its necessity must be evaluated in light of the specific facts of the case. For instance, if the need for a specialist would be obvious to a layperson, there would be no need to present expert testimony in order to establish that the failure to refer violated the Eighth Amendment. See Franklin, slip op. at 4 (noting that when the need for a specialist would be obvious to a layperson, the failure to refer would be actionable).

Evaluating the need for an expert in light of the facts of the case is where the Medical Defendants fail miserably. This plaintiff brought serious allegations of abuse. Those allegations needed to be addressed on the merits. Unfortunately, the Medical Defendants provided virtually no help in reviewing the complex medical history underlying this case. Apparently, the Medical Defendants were prepared to have plaintiff brought back to Kansas from Florida in order to try this case to a jury. Following a lengthy and thorough review of the evidence in the record, it became apparent that a trial was not warranted. The Medical Defendants should have addressed the merits of plaintiff's claims rather than trying to duck the hard work in the fashion the court often sees in prison civil rights cases.

plaintiff concluded was required.   (Doc. 142 at 7.)   However,
plaintiff presented no evidence showing that anyone other than himself
thought a heart catheterization was necessary.   "A medical decision
not to order an X-ray, or like measures, does not represent cruel and
unusual punishment." Estelle, 429 U.S. at 107, 97 S. Ct. at 293.
This is a mere difference of opinion between defendant Dayan and
plaintiff, which cannot support an Eighth Amendment claim. Ramos, 639
F.2d at 575.

In many respects, this case is not materially different from
Olson v. Stotts, 9 F.3d 1475 (10th Cir. 1993), wherein the court of
appeals said,

> With regard to plaintiff's enlarged claim that he
> was made to suffer for eighteen months while the
> prison failed to provide him with a heart
> specialist and surgery, we again look solely to
> the medical records that plaintiff submits in
> support of his claim of deliberate indifference.
> Rather than support a claim of deliberate
> indifference, the attachments show appropriate
> medical treatments prior to hospitalization. In
> his discharge summary, the heart specialist
> specifically states, "The patient was admitted to
> the hospital because of recurrent chest pain
> treated with Nitroglycerine effectively."
> Discharge Summary, p. 1.  "In order to state a
> cognizable claim, a prisoner must allege acts or
> omissions sufficiently harmful to evidence
> deliberate indifference to serious medical
> needs." Estelle, 429 U.S. at 106, 97 S. Ct. at
> 292 (emphasis added).  In Wilson v. Seiter, 501
> U.S. 294, 111 S. Ct. 2321, 115 L. Ed. 2d 271
> (1991), the Court clarified and emphasized the
> Eighth Amendment's deliberate indifference
> standard under Estelle. "[O]nly the '"unnecessary
> and wanton infliction of pain"' implicates the
> Eighth Amendment." Id. 501 U.S. at ----, 111 S.
> Ct. at 2323 (emphasis in the original) (quotation
> omitted).
>     During the entire period of the alleged
> delay, plaintiff received effective medication.
> At most, plaintiff differs with the medical
> judgment of the prison doctor, believing that he

-48-

> should have received his elective surgery sooner
> than he did. Such a difference of opinion does
> not support a claim of cruel and unusual
> punishment.

Id. at 1477.  Like the plaintiff in Olsen, plaintiff was receiving heart medications during the entire time he awaited his various consultations and outside tests.  He admits that he took nitroglycerin tablets to ease his chest pains (Doc. 148 exh. 10, Aff. of Ana Cecelia Malagnon-Halpin, Dec. 8, 2001)[13], and the record shows that his complaints of chest pain were generally limited to periods of heavy exertion and temperature extremes.  (See, e.g., Doc. 198 exh. D at 877, Outpatient Referral Request Form, July 2, 1998; exh. D, progress note, Sept. 5, 2003; exh. D, progress note, Sept. 26, 2003; exh. I at 1507, progress note, May 21, 2002; exh. I at 213, office consultation note, Dec. 4, 2002.)  The court finds no evidence to support the idea that Dr. Dayan was deliberately indifferent to plaintiff's heart condition, the only serious malady that Dr. Dayan was asked to treat. Accordingly, the court finds that defendant Dayan is entitled to summary judgment.

   2.  Defendant Dr. Akin Ayeni

   According to the amended complaint and plaintiff's affidavit, the only culpable conduct with which defendant Ayeni is charged relates to his role in denying the requests for referral to a cardiologist in 1998.  (Docs. 13 at 9-12; 142 at 1-3.)  The relevant facts show that defendant Ayeni simply denied "routine" requests for cardiology

---

   [13] The court characterizes this as an admission by plaintiff in that he chose to include his wife's affidavit in his amended complaint.  In her affidavit, plaintiff's wife recounts several instances where she saw plaintiff take nitroglycerin pills to relieve chest pain.

referrals that were inadequately documented.  The requests conveyed no sense of urgency, and were devoid of any indication that plaintiff's symptoms had changed such that immediate treatment was required.  Moreover, one of the denials clearly indicates that, had this been characterized as an emergency, Dr. Ayeni would have approved the referral.  (Doc. 198 exh. D at 1108, Outpatient Referral Request Denied, Aug. 17, 1998.)  Once proper documentation was provided, Dr. Ayeni sought approval from FDOC for the consultation.  The uncontroverted evidence shows that FDOC officials admitted any delay beyond the date of the request was their fault.

At most, the evidence against Dr. Ayeni shows a mere difference of opinion between plaintiff and the doctor regarding the medical necessity of expediting his request.  Moreover, as to both Drs. Dayan and Ayeni, plaintiff provides no evidence that the delay caused him substantial harm.  On the contrary, the results of the consultation and subsequent thallium stress test were minor adjustments in medication, with no substantive changes to the treatment previously provided by Dr. Dayan.  Thus, the court finds that defendant Ayeni is entitled to summary judgment.

3.   Defendant Dr. Sandip Naik

Dr. Naik provided care and treatment to plaintiff from approximately May 2001 through June 2002.  During that time he had the displeasure of dealing with all three of plaintiff's "serious medical needs."  Although plaintiff disparages the treatment he received from Dr. Naik almost from the beginning (Doc. 13 at 12-13), the record shows that plaintiff received appropriate treatment for his problems.

First, there is no evidence that Dr. Naik interfered with the

-50-

medications plaintiff was taking for his heart. Additionally, shortly after plaintiff began seeing Dr. Naik, Dr. Mancina sent his May 30, 2001 letter to Lansing medical officials recommending that plaintiff be seen as a followup to his 1999 thallium test. (Doc. 198 exh. C, letter from Dr. Mancina to LCF medical director, May 30, 2001.) Common sense suggests the letter must have reach the prison doctors in early June, and plaintiff was seen by Dr. Mancina for this routine examination a brief time later, on July 19, 2001. (Doc. 198 exh. C, letter from Dr. Mancina to Dr. Naik, Aug. 10, 2001.)

Shortly after receiving Dr. Mancina's letter, Dr. Naik saw plaintiff, implemented some, if not all, of Dr. Mancina's recommended changes to medication, and requested another thallium stress test. The thallium scan was performed on September 25, 2001. The only evidence as to Dr. Mancina's recommendations in light of the thallium test shows that the doctor merely recommended observing plaintiff's response to the medication changes. (Doc. 198 exh. C at 206, letter from Dr. Mancina to Ana Halpin, Nov. 7, 2001.)

At this point, Dr. Naik became faced with the challenge of balancing treatment for plaintiff's heart with his sinus and skin problems. Plaintiff admits that he received antibiotic treatment for his sinus problems beginning the first time he sought treatment from a PA. (Docs. 13 at 21; 198 at 8.) Plaintiff bemoans a handful of encounters with Dr. Naik following his initial treatment, but provides no evidence that Dr. Naik interfered with the ongoing antibiotic regimen. Plaintiff was once again given antibiotics by a PA on August 1, 2001; but, that prescription expired on its own terms on August 14, 2001. On that date, plaintiff was seen by Dr. Naik, who concluded

that plaintiff did not have an infection; accordingly, no additional antibiotics were prescribed. Plaintiff provides no evidence that anyone had diagnosed him with an infection prior to this date; nor does he provide any expert testimony to show that Dr. Naik's performance up to this point was so abysmal as to fall below constitutional standards. Nonetheless, plaintiff admits that just one week later, on August 21, 2001, Dr. Naik prescribed an antibiotic for his sinus condition.

Plaintiff further admits that on October 3, 2001, Dr. Naik informed he that he would be sent to an ear, nose, and throat specialist. He was seen by the ENT on October 31, 2001, and the recommended treatment was endoscopic sinus surgery. Following a brief attempt at alternative treatment ordered by Dr. Baker, PHS approved plaintiff for sinus surgery. Unfortunately, the ENT's anesthetist recommended against the surgery because of plaintiff's heart condition. Notably, the ENT characterized the cancelled surgery as "elective" in nature. (Doc. 198 exh. K, letter from Dr. Tumanut, July 14, 2005 (emphasis added).)

Faced with this dilemma, Dr. Naik referred plaintiff to another ENT for a second opinion. This specialist, Dr. Ranzenberger, suggested a brief attempt at medication. When that failed, Dr. Ranzenberger was prepared to perform the necessary surgery using a local anesthetic that would not require plaintiff to undergo general anesthesia, thereby avoiding the conflict with his cardiac condition.

-52-

Plaintiff declined the surgery sometime around May 13, 2002.[14]

Around the same time, prison healthcare workers were also giving plaintiff antibiotics and topical creams for his skin problems. The first real evidence related to Dr. Naik shows that on May 9, 2002, the doctor prescribed plaintiff prednisone pills and a topical medication. Then, on June 10, 2002, plaintiff was seen by another cardiologist, Dr. Mehta, at the urging of the PHS medical director, Dr. Baker. Plaintiff refused further treatment from Dr. Mehta based on the fact that Dr. Mehta was from India and he knew Dr. Naik.[15] That same day, plaintiff was seen by Dr. Naik for complications stemming from plaintiff's having refused his sinus surgery. Dr. Naik graciously continued treatment of plaintiff by offering more antibiotics.[16]

---

[14] Plaintiff criticizes Dr. Ranzenberger and Dr. Mehta, the cardiologist whose surgery plaintiff also refused. Plaintiff suggests that these men were not qualified to perform the recommended medical procedures and that he was justified in refusing their treatment while still maintaining his Eighth Amendment claims against the Medical Defendants. Plaintiff is not qualified to judge the credentials of these doctors. That responsibility falls on the state licensing authorities. There is no evidence that they lacked licenses to perform the procedures that plaintiff refused. If the state licensing authorities are satisfied with these doctors' credentials, a prisoner will not be heard to refuse the treatment, claim that the doctors were unqualified, and then maintain an Eighth Amendment claim based on the very treatment that the prisoner, himself, refused.

[15] Plaintiff will not be heard to suggest that Dr. Mehta was unqualified based, in whole or in part, on the racially bigoted observation that the doctor was from India or any other country. To the extent plaintiff merely presumes an association between Dr. Mehta and Dr. Naik because they come from the same country, the court notes that recent population figures suggest that over a billion people live in India - hardly the sort of place where everyone knows everyone else.

[16] Plaintiff offers no expert testimony to suggest what the appropriate treatment was. Plaintiff had refused surgery, and the court, being a layman as to medical issues, has no idea what treatment might be appropriate other than antibiotics.

Sometime shortly after these June contacts, it appears that Dr. Naik ceased to be employed at PHS. In reviewing the evidence, the court finds no basis to conclude that Dr. Naik "fail[ed] to treat a serious medical condition properly." Sealock, 218 F.3d at 1211. On the contrary, Dr. Naik followed the recommendations of Dr. Mancina, and obtained (or at least had no role in interfering with) the recommended thallium scan. There is no evidence from which to conclude, one way or the other, whether Dr. Naik had a role in arranging the subsequent cardiac consultation with Dr. Mehta, which appears largely to have been guided by Dr. Baker in the wake of plaintiff's having refused his sinus surgery. The important point, though, is that there is no evidence to suggest that Dr. Naik interfered with plaintiff's ability to receive the consultation and, of course, plaintiff can show no harm because he admits to having refused treatment from Dr. Mehta.

Likewise, the record shows that, while Dr. Naik doubted the existence of a sinus infection, he had no role in interfering with prescribed treatment or denying plaintiff access to necessary treatment. In fact, Dr. Naik referred plaintiff to the ENT specialist, Dr. Tumanut. (Doc. 198 exh. K at 1528, Regional Approval, Oct. 8, 2001.). When Dr. Tumanut declined to perform what he characterized as an elective surgery, Dr. Naik sought a second opinion. This second ENT specialist concluded that surgery could be done under local anesthetic. It was plaintiff who decided to forego the treatment. Thus, Dr. Naik had absolutely no role in denying plaintiff treatment. In fact, he went out of his way to find a way to get plaintiff the relief he needed.

-54-

As for the skin problem, the evidence shows Dr. Naik prescribed medications, and that those medications yielded some improvement, albeit perhaps temporary. (Doc. 198 exh. K at 411, progress note, June 20, 2002.) Even if the treatment was unsuccessful, plaintiff presents no evidence that it was inappropriate.

In sum, even assuming the truth of plaintiff's statements regarding the rude things Dr. Naik said to him during their encounters, the record shows that Dr. Naik provided more than superficial treatment to plaintiff's serious needs. The evidence further shows that plaintiff bears much of the blame for delays in treatment of his heart and sinus problems because he refused treatment from two of the outside specialists provided for him. Defendant Dr. Naik is entitled to summary judgment on all claims.

4.   Defendant Dr. James Baker

A review of the complaint shows that plaintiff's only gripes against Dr. Baker stem from the doctor's involvement in his care following plaintiff's refusal of sinus surgery. The evidence shows that, prior to this time, Dr. Baker's only involvement was to defer Dr. Naik's request for endoscopic sinus surgery so that an alternative medical therapy could be attempted. (Doc. 198 exh. K at 1522, Outpatient Referral Request Denied, Nov. 19, 2001.) Following failure of that treatment, Dr. Baker approved the surgery. (Doc. 198 exh. K at 1519, regional approval, Jan. 8, 2002.) Then, after plaintiff refused the sinus surgery, Dr. Baker saw him and ordered that he be referred to a cardiologist so that his heart condition could be addressed, thereby clearing the way for treatment of his sinus condition. (Doc. 198 exh. I at 1507, progress note, May 21, 2002.)

Case 5:01-cv-03188-MLB-KMH   Document 269   Filed 01/12/06   Page 56 of 62


This evidence shows that, far from being indifferent to plaintiff's medical needs, Dr. Baker was highly responsive. He affirmatively sought out treatment for plaintiff's maladies, even in light of the undoubtedly frustrating complications generated by plaintiff's fickleness in proceeding with treatment once prescribed.[17] There is simply no basis - not the slightest bit of evidence - on which to make Dr. Baker stand trial for deliberate indifference. His motion for summary judgment is GRANTED.

    5.  Dr. Carlos Petit

    Plaintiff's allegations against Dr. Petit relate to the time period of August 2002 through December 2002. A review of the complaint leaves plaintiff's gripes about Dr. Petit rather unclear. Although plaintiff appears to suggest that Dr. Petit delayed obtaining treatment for him, plaintiff was careful to omit a very important fact in the complaint - within approximately one month from the first time Dr. Petit saw plaintiff, the doctor had plaintiff scheduled for a heart catheterization with a cardiologist. (Doc. 198 exh. K at 404, progress note, Sept. 20, 2002.) Four days later, plaintiff refused the procedure. (Docs. 198 exh. I, progress note, Oct. 8, 2002; 165 at 4; 183 at 3.) Six weeks later, Dr. Petit informed plaintiff that he had been scheduled with a different cardiologist, and plaintiff saw that specialist, Dr. Dulin, on December 4, 2002. Under these facts, there is no basis to conclude that Dr. Petit was indifferent to plaintiff's heart condition.

    With respect to plaintiff's skin condition, Dr. Petit diagnosed

_____

[17] Fickleness is a charitable description of plaintiff's conduct.

-56-

him with bacterial folliculitis. The evidence shows that on August 30, 2002, shortly after plaintiff began seeing Dr. Petit, the doctor prescribed Erythromycin for thirty days, along with a topical cream to treat plaintiff's rash. (Doc. 198 exh. L at 407, progress note, Aug. 30, 2002.) The evidence in the record shows that plaintiff next saw Dr. Petit about his skin condition on December 2, 2002. (Doc. 198 exh. L at 401, progress note, Dec. 2, 2002.) The notes indicate that plaintiff stated his condition was improving, but still needed treatment. Dr. Petit provided that treatment with a new medication, Dycloxacillin. Id. From that point on, the medical records show that plaintiff's skin condition was treated by Dr. Stanton, who is not a defendant.

It is abundantly clear from the evidence plaintiff presented that Dr. Petit prescribed different medications than plaintiff had previously received, and that those medications provided him some relief. On this record, there is no basis to find that Dr. Petit was deliberately indifferent to plaintiff's skin condition.

Finally, Dr. Petit's only involvement in plaintiff's sinus condition was a visit on September 20, 2002, in which the doctor mapped out a plan to treat plaintiff's heart condition first, then arrange the sinus surgery. (Doc. 198 exh. K at 404, progress note, Sept. 20, 2002.) Plaintiff quickly foiled that plan when he declined the heart catheterization four days later. Plaintiff alleges that he saw Dr. Petit once more for his sinus condition on December 2, 2002. (Doc. 13 at 28.) The record does not support this assertion, showing only that plaintiff was seen for his skin infection. (Doc. 198 exh. L at 401, progress note, Dec. 2, 2002.) Even assuming that he was

-57-

seen for his sinus condition, the complaint makes no allegations of misconduct regarding that condition; instead, plaintiff merely asserts facts regarding his skin malady.  (Doc. 13 at 28.)  Construing the evidence in the light most favorable to plaintiff, it still fails to show that Dr. Petit was indifferent to plaintiff's sinus condition.

Since plaintiff puts forth no expert testimony suggesting that the treatment he received was so woefully inadequate as to amount to deliberate indifference, and since, from a layman's perspective, it is patently obvious that Dr. Petit offered efficacious treatment for all plaintiff's medical problems, the doctor's motion for summary judgment is granted.[18]

6.  Defendant Angela Goehring

Plaintiff's only complaints against Ms. Goehring relate to her role in responding to the prison grievances in which he complained about the treatment he received for his various maladies.  (Doc. 13 at 32-39.)  Even assuming that she could be held liable for an Eighth Amendment violation had plaintiff's allegations been supported by the evidence, common sense dictates that a prison healthcare administrator cannot be deliberately indifferent to a prisoner's serious medical needs simply by defending the actions of prison doctors when the doctors themselves have not violated the Eighth Amendment.  Ms. Goehring is also entitled to summary judgment.

---

[18] In Count Five of the amended complaint, plaintiff also makes allegations that Dr. Petit was involved in changing his medical grade classification.  (Doc. 13 at 51.)  Plaintiff presents no evidence on this point, and conceded the inadequacy of this claim as to the other defendant allegedly involved, Elizabeth Rice.  (Doc. 70; see also Docs. 64, 75.)  Since plaintiff has no evidence on this point, Dr. Petit is entitled to summary judgment on this claim as well.

7.  PHS

Having found that all PHS employees and former employees are entitled to summary judgment, and finding that there are no allegations in the complaint that suggest PHS should be held directly liable for deliberate indifference, the only remaining option is vicarious liability.  It is well established that a private actor cannot be held liable under 42 U.S.C. § 1983 on a theory of respondeat superior.  Dubbs v. Head Start, Inc., 336 F.3d 1194, 1216 (10th Cir. 2003).  PHS's motion for summary judgment is therefore granted.

8.  State law claims

To the extent that the amended complaint can be construed as stating a state law claim for medical malpractice against the Medical Defendants, they are entitled to summary judgment on those claims as well.  As the Medical Defendants correctly pointed out in their brief, under Kansas law, a medical negligence claim of this sort cannot be maintained without expert testimony to establish the appropriate standard of care, and to prove that a defendant deviated from that standard of care.  Nold v. Binyon, 272 Kan. 87, 103-04, 31 P.3d 274, 285 (2001).  Plaintiff has put forth no expert testimony on these points.  Accordingly, all Medical Defendants are entitled to summary judgment on any claims of medical negligence.

## IV.  REMAINING CLAIMS AGAINST KDOC DEFENDANTS

In a previous order, Judge Van Bebber ruled that the only claims remaining against the KDOC Defendants were for deliberate indifference.  (Doc. 12 at 3-5.)  The only evidence regarding the involvement of these defendants in the deliberate indifference claims relates to their handling of plaintiff's grievances.  Since the

-59-

doctors who treated plaintiff were not deliberately indifferent, there is no basis to hold prison officials accountable for rejecting plaintiff's complaints against these doctors.  Although it would ordinarily be inappropriate for the court to rule on such matters without a motion to dismiss on that basis, "a court may dismiss sua sponte when it is patently obvious that the plaintiff could not prevail on the facts alleged and allowing him an opportunity to amend his complaint would be futile." Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991) (citation and internal quotation marks omitted). There is nothing plaintiff could add to his complaint to state a deliberate indifference claim against the KDOC Defendants.  All claims against them are accordingly DISMISSED.

## V.   CONCLUSION

In sum, the thorough and painstaking review presumably contemplated by the court of appeals reaches the same result found by Judge Van Bebber.  Plaintiff has no evidence that defendants were deliberately indifferent to his medical problems.  Instead, the record conclusively demonstrates that each time plaintiff found himself on the cusp of receiving the surgeries he claims he so desperately needed - indeed, treatment he had sought and demanded - plaintiff refused the procedures.  That is his prerogative, but decisions have consequences. Accordingly, he will not now be heard to complain that subsequent delays in treatment, including the very treatments that he refused, somehow amounted to constitutional violations.  In other words, the evidence presented by the parties, even construed in the light most favorable to plaintiff, is insufficient to create a triable issue on the subjective component of a deliberate indifference claim as to any

-60-

defendant.  But the evidence also shows that a convicted criminal serving a life sentence has better access to medical treatment than thousands upon thousands of law-abiding citizens who have no insurance and cannot afford medical care.  None of these citizens can complain about their treatment, or lack thereof, to the federal courts.  It takes no imagination to predict how plaintiff's complaints would be handled in the court of public opinion.

Accordingly, the Medical Defendants' motion for summary judgment is GRANTED.  For reasons already stated, the KDOC Defendants' motion for judgment on the pleadings is DENIED, and plaintiff's motion to strike is DENIED.  Finding no merit to the remaining claims against the KDOC Defendants, this case is DISMISSED with prejudice.[19]  All other pending motions are therefore MOOT.

A motion for reconsideration of this order under Local Rule 7.3 is not encouraged.  The standards governing motions to reconsider are well established.  A motion to reconsider is appropriate where the court has obviously misapprehended a party's position or the facts or applicable law, or where the party produces new evidence that could not have been obtained through the exercise of reasonable diligence.  Revisiting the issues already addressed is not the purpose of a motion to reconsider and advancing new arguments or supporting facts which were otherwise available for presentation when the original motion was briefed or argued is inappropriate.  Comeau v. Rupp, 810 F. Supp. 1172 (D. Kan. 1992).  Any such motion shall not exceed three pages and

---

[19] As the party bearing the burden of proof, plaintiff has failed to meet the lofty requirements that would entitle him to summary judgment as to any defendant.  Plaintiff's motion for partial summary judgment is DENIED.

-61-

shall strictly comply with the standards enunciated by this court in
Comeau v. Rupp.  The response to any motion for reconsideration shall
not exceed three pages.  No reply shall be filed.

IT IS SO ORDERED.

Dated this   12th   day of January 2006, at Wichita, Kansas.


                                    s/  Monti Belot
                                    Monti L. Belot
                                    UNITED STATES DISTRICT JUDGE